```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF LOUISIANA
                         ALEXANDRIA DIVISION
UNITED STATES              CRIMINAL ACTION NO. 10-351
VERSUS                     U.S. DISTRICT JUDGE DEE D. DRELL
SANDERS                    U.S. MAGISTRATE JUDGE JAMES D. KIRK
```

REPORT AND RECOMMENDATION

This is a motion to suppress two statements made by the defendant, Thomas Steven Sanders. The district judge referred the matter to me for hearing which was held on February 10, 2012.

The defendant moves to suppress (**doc. #45**) statements he made to FBI agents soon after his arrest on November 14, 2010, including "I killed them both", on the grounds that defendant withdrew his voluntary waiver of his Miranda rights. The government argues that defendant asserted his right to remain silent only as to a few particular questions.

Background Facts

Thomas Steven Sanders lived at a storage facility in Las Vegas, There he apparently met Suellen Roberts along with Suellen's 12 year old daughter, Lexis. The three planned a trip over the Labor Day weekend because Lexis wanted to see "Bearizona", a wildlife park in Williams Arizona, near the Grand Canyon. After visiting the park, the three headed back toward Las Vegas, having spent the night in a motel and swimming in the motel pool. On the way back to Nevada, Sanders pulled off the highway, ostensibly so

that Suellen could shoot his .22 rifle and then shot Suellen once in the head, in front of her daughter, Lexis, killing her. Leaving Lexis' mom's body lying in the desert, Sanders then loaded Lexis, who was in hysterics over seeing her mother murdered, into the car and traveled to Louisiana. He took Lexis to a wooded area and shot her in the back of the head and, when she didn't die, he shot her twice more in the head. When she still didn't die, he tried to shoot her through the heart. When she still didn't die, he cut her throat, killing her. Sanders denied raping or otherwise abusing Lexis. He left her body in the woods where hunters eventually found Lexis' remains.

After identifying Sanders as Lexis' likely murderer, law enforcement began a manhunt for him. After he was spotted at the Flying J truck stop in Gulfport, Mississippi, officers identified him at the truck stop in the early morning hours of November 14, 2010. Sanders was arrested at 7:10 a.m. that morning. He asked the officers words to the effect: "what took you so long"?

After handcuffing Sanders, FBI Special Agent Kelly obtained consent to search Suellen's vehicle which Sanders was driving. Sanders was placed in an FBI vehicle and Agent Kelly and Task Force Officer Ron Werby interviewed Sanders, beginning at 7:30 a.m. and lasting at least 30 to 40 minutes. Prior to beginning the questioning, Agent Kelly advised Sanders of his rights, including his right to remain silent and his right to an attorney, and

Sanders understood and waived his rights, signing a waiver of rights form to that effect. Sanders explained, among other things that he had stolen a license plate for the car in New Orleans. Agent Kelly asked where Suellen Roberts was and Sanders responded that she was dead, "I killed her, I killed them both". When Sanders was asked why he killed Suellen, he responded that "he wanted to speak to an attorney before answering that question". Agent Kelly changed the subject and never again asked him why he killed Suellen. Sanders explained that the three were on their way back from Bearizona on Labor Day weekend when he stopped to let Suellen shoot his .22 rifle when he shot Suellen once in the head, killing her. When asked why he killed Lexis, Sanders again said that he wanted to speak to an attorney before answering that question. Kelly clarified that Sanders was willing to continue the interview, but not answer those two questions. Agent Kelly again changed the subject and never again asked him why he killed Lexis. Later, when asked what he had been doing in Nevada, Sanders again said he wanted to talk to a lawyer before answering that question. Agent Kelly again changed the subject and did not return to that question. The interview was not recorded, in accordance with FBI policy.

After being taken to jail, FBI Special Agent Walsh and Task Force Officer Moore traveled to the Mississippi jail and

interviewed Sanders.[1] Before asking questions, they again advised Sanders of his rights and Sanders signed a second waiver of rights form. The purpose of this second interview was to try and locate Suellen's body. When Agent Walsh asked Sanders "and you worked for a mattress company out there" Sanders responded that he wanted to talk to an attorney "before I answer that question or anything to do with other people". Sanders expressed his willingness to talk about other subjects, however.

## Applicable Law

The government has the burden of proving by a preponderance of the evidence that defendant voluntarily waived his rights and that the statements he made were voluntary.  Voluntariness depends on the totality of the circumstances and must be evaluated on a case by case basis under Colorado v. Connelly, 479 U.S. 157 , 107 S.Ct. 515, 520-21, 93 L.Ed. 2d 473 (1986).  A confession is voluntary in the absence of official overreaching, in the form of either direct coercion or subtle forms of psychological persuasion.  U.S. v. Rojas-Martinez, 968 F.2d 415, 418 (5th Cir. 1992), cert.den., 506 U.S. 1059, 113 S.Ct. 995, 122 L.Ed.2d 146 (1993).  Also, U.S. v. Raymer, 876 F.2d 383, 386-87 (5th Cir.), cert.den., 493 U.S. 870, 110 S.Ct. 198, 107 L.Ed.2d 152 (1989); Bell v. Lynaugh, 663 F.Supp. 405, 413 (E.D.Tex.), aff'd, 828 F.2d 1085 (5th Cir.), cert. den., 484 U.S. 933, 108 S.Ct. 310, 98 L.Ed.2d 268 (1987).  In order for

---

[1] This interview was recorded and was played in its entirety for the court.

a defendant to establish that his confession was involuntary, he must demonstrate that it resulted from coercive police conduct and that there was a link between the coercive conduct of the police and his confession.  U.S. v. Bell, 367 F.3d 452, 461 (5th Cir. 2004).

Coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.  Penry v. Lynaugh, 832 F.2d 915, 918 (5th Cir. 1987), rev'd in part on other grounds, 492 U.S. 302, 109 S.Ct. 2934 (1989), citing Connelly, 107 S.Ct. at 522.  Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment.  Connelly, 107 S.Ct. at 524.

Whenever the government bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of the Miranda doctrine, the government need prove waiver only by a preponderance of the evidence.  The sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion.  The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word.  Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515 (1986).

There is a presumption against waiver. North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757 (1966).  The

prosecution bears the burden of proving by a preponderance of the evidence that a defendant knowingly and intelligently waived his Miranda rights. Colorado v. Connelly, supra. To satisfy this burden, the prosecution must introduce sufficient evidence to establish that under the "totality of the circumstances," the defendant was aware of the nature of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1136, 1141 (1986).

When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated interrogation, even if he has been advised of his Miranda rights. Edwards v. Arizona, 451 U.S. 477, 101 S. Ct 3128 (1981). And, while an ambiguous or equivocal reference to an attorney does not require that law enforcement cease questioning, a police officer must cease questioning a suspect if the suspect "articulate[s] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. U. S., 114 S. Ct 2350 (1994).

However, it is clear that an accused may choose to talk about certain aspects of the case even though he is unwilling to talk about others without a lawyer. Connecticut v. Barrett, 107 S. Ct. 828 (1987), United States v. Ivy, 929 F.2d 147 (5th Cir. 1991),

6

cert. Den. 112 S. Ct. 234.

In <u>Ivy</u>, Ivy was arrested and advised of his Miranda rights. He did not immediately invoke those rights, however. But during questioning, when he was asked "who can you get dynamite from?" Ivy responded, "I'll tell you, let me talk to my lawyer before I answer that." On appeal, the Fifth Circuit observed that Ivy had expressed his unwillingness to answer questions about the dynamite and the interrogating officer honored his request by moving to a different subject. The court held the statement should not be suppressed.

<u>Discussion and Analysis</u>

In this case, before defendant had ever mentioned the word "lawyer", and after he had waived his rights and signed a waiver form, Sanders admitted "I killed her. I killed them both."

Defendant only asked for an attorney with respect to four specific questions: 1) why he killed Suellen, 2) why he killed Lexis, 3) what he had been doing while in Nevada, and 4) whether he had worked for a mattress company. Each time such request to talk to an attorney before answering those questions was made, the request was honored and the questioning moved to another subject. Indeed, after the second such request, Agent Kelly asked Sanders "are you-just to clarify, are you willing to answer all these other questions that we're-that you're answering and discuss what you're talking about?" Sanders said he was. While Sanders, through counsel, argues that agents may not use the guise of

7

"clarification" to convince a suspect to continue to waive his Miranda rights, that is not what happened here. In fact, the opposite is true. Here Agent Kelly was bending over backwards to protect Sanders' rights and to be absolutely sure that Sanders wanted to continue talking about other things. These facts were corroborated by Investigator Werby. When agents eventually received from Sanders what they accepted as an unambiguous request for an attorney, the interview was promptly concluded.

Therefore, I find, by a preponderance of the evidence, that each statement by Sanders that he wished to speak with a lawyer before answering that particular question was unambiguously directed to those particular questions only and that Sanders was not requesting an attorney before continuing with the interview. Sanders was very clear and specific in indicating what areas of the interview he would and would not discuss without a lawyer and there is no question in my mind that his actions and choices were knowing and voluntary.

For the foregoing reasons, IT IS RECOMMENDED THAT the Motion to Suppress, doc. #45, be DENIED.

## **OBJECTIONS**

Under the provisions of 28 U.S.C. § 636(b)(1)  © and Fed.R.Civ.P. 72(b), the parties have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the clerk of court. No other briefs or

responses (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection tot he magistrate judge is neither required nor encouraged. Timely objections will be considered by the district judge before he makes his final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this 7th day of March, 2012.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE