RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 6/9/14

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| UNITED STATES OF AMERICA | CRIMINAL ACTION NO. 10-00351 |
|---|---|
| -vs- | JUDGE DRELL |
| THOMAS STEVEN SANDERS | MAGISTRATE JUDGE KIRK |

## RULING

Before the Court is a Motion to Dismiss Indictment (Doc. 147) filed by Defendant, Thomas Steven Sanders. For the following reasons, Defendant's motion will be **DENIED**.

I. <u>Background</u>

On January 26, 2011, a grand jury returned a two-count superseding indictment charging Defendant with interstate kidnapping pursuant to 18 U.S.C. § 1201(a)(1), and carrying/using a firearm in relation to a crime of violence and causing the death of another through the use of a firearm pursuant to 18 U.S.C. § 924(c)(1)(A) and (j)(1). (Doc. 25). The superceding indictment also includes a Notice of Special Findings listing statutory aggravating factors under 18 U.S.C. §§ 3591 and 3592, the Federal Death Penalty Act. Defendant was arraigned on the superseding indictment on February 11, 2011, and entered pleas of not guilty to both counts. (Doc. 30). The United States of America ("Government") then filed a Notice of Intent to Seek the Death Penalty pursuant to the indictment on August 1, 2012. (Doc. 73). Trial in this matter is scheduled to begin on August 18, 2014. (Doc. 146).

The grand jury which issued the superseding indictment against Defendant was empaneled on September 22, 2010, by U.S. Magistrate Judge Mark Hornsby. It was drawn from a master jury wheel that was filled in November 2007, and was selected from the Alexandria, Monroe, and Shreveport Divisions of the Western District of Louisiana. The procedures used to select potential members for this grand jury are set out in the Jury Plan for the United States District Court Western District of Louisiana (Revised 5/5/98) (Doc. 150-1) ("Jury Plan"), which is designed to select grand and petit jurors from a fair cross-section of the community, and calls for the creation of a master jury wheel in each of the five court divisions drawn at random from the voter registration lists of each parish in the division. (Jury Plan, ¶ 4(1)). The Jury Plan also provides that the master jury wheels be emptied and refilled every four years, and that the Clerk of Court for the Western District of Louisiana make periodic reports of their demographic composition by comparing statistical jury wheel samples against general population data from U.S. Census Bureau records. (Jury Plan, ¶¶ 4(4), 16). According to the Clerk of Court's AO12 Report on Operation of the Jury Selection Plan for the November 2007 master jury wheel ("AO12 Report"),[1] the percentage of African Americans in the citizen population of the Alexandria, Monroe, and Shreveport divisions is 32.00%, while the percentage of African Americans on the qualified jury wheel for those three divisions is 23.35%. (Doc. 150-2).

---

[1] See 28 U.S.C. §§ 1863(a), 1868; Jury Plan, ¶¶ 4(4), 17. During oral argument, both parties acknowledged that the AO12 Report is maintained by the Clerk of Court and forwarded to the Administrative Office of the Courts in Washington, D.C.

2

On August 19, 2013, Defendant filed the present Motion to Dismiss Indictment (Doc. 147), arguing the Court's jury-selection process violates the Sixth Amendment's fair cross-section requirement, the Fifth Amendment and his rights to due process and equal protection, and the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, *et seq.* ("JSSA"). The Government has opposed the motion. (Doc. 150). Oral argument was held on February 19, 2014, and disposition of the motion is now appropriate. After carefully considering the evidence, argument, and briefs of counsel, the Court makes the following determinations and conclusions:

II. <u>Law and Analysis</u>

Defendant objects to the grand jury venire as violating the Fifth and Sixth Amendments to the Constitution and the JSSA, in its alleged substantial underrepresentation of African Americans by an absolute disparity of 10.81%. In calculating this disparity, Defendant compares the percentage of African Americans on the qualified jury wheel for the Alexandria, Monroe, and Shreveport Divisions (23.35%) to the 2007-2011 American Community Survey Selected Population Tables ("ACS Estimates") issued by the U.S. Census Bureau, which indicate the percentage of African Americans age 18 and over in the three divisions from which the grand jury was drawn is 34.16%.[2] (<u>See</u> Doc. 160 at pp. 2–3). Defendant also objects to the use of Louisiana voter

---

[2] Defendant proposes several different calculations in the present motion. For example, he calculates a 10.59% disparity using the 2006-2010 ACS Estimates, which indicate that African Americans comprise 33.94% of the population in the relevant court divisions. (<u>See</u> Doc. 147-1 at pp. 2–3; Doc. 160 at pp. 2–3). Then, using the 34.19% population figure, Defendant calculates that African Americans were underrepresented on the qualified jury wheel of the Alexandria Division by an absolute disparity of 10.96%. (<u>See</u> Doc. 147-1 at p. 6). However, these figures do not change our analysis or conclusion. Thus, for purposes of this ruling, we will analyze Defendant's claims using the 10.81% figure referenced in his most recent filing. (<u>See</u> Doc. 160 at p. 3).

3

registration lists as the exclusive source of potential jurors, arguing that other sources are needed to ensure a fair cross-section of the community will be represented on the Court's jury wheel. In support of this argument, Defendant cites a pending lawsuit in the Middle District of Louisiana, United States v. Louisiana, No. 3:11-cv-00470 (M.D. La. July 12, 2011) (Doc. 125, Exh.1), in which the United States, through the Department of Justice Civil Rights Division, has sued the State of Louisiana under the National Voter Registration Act for failing to provide voter registration opportunities at state offices providing public assistance.

During oral argument, Defense counsel acknowledged that the alleged statistical disparity of 10.81% is the sole basis for Defendant's claims. Moreover, both parties agreed that the AO12 Report, which relies on the 2000 Decennial Census figures, shows a disparity of less than 10%. However, Defendant contends the 2007 jury wheel should be analyzed using the more current ACS Estimates, rather than the 2000 Census data, given that the grand jury was empaneled in September 2010 and the superseding indictment was returned in January 2011.

A.  Sixth Amendment

The Sixth Amendment guarantees a criminal defendant the right to a jury randomly selected from a fair cross-section of the community.[3] U.S. v. Alix, 86 F.3d 429, 434 (5th Cir. 1996) (citing Taylor v. Louisiana, 419 U.S. 522, 537 (1975)). While a defendant is "not entitled to a jury of any particular composition, . . . the jury wheels,

---

[3] This is true regardless of the particular defendant's race. See Peters v. Kiff, 407 U.S. 493, 504 (1972) (holding that "whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law."). Defendant Sanders is Caucasian.

pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Taylor, 419 U.S. at 538. The Fifth Circuit has held that

> a jury list drawn objectively, mechanically, and at random from the entire voting list of a county is entitled to the presumption that it is drawn from a source which is a fairly representative cross-section of the inhabitants of that jurisdiction. The presumption, of course, is rebuttable but the challenger must carry the burden of showing that the product of such a procedure is, in fact, constitutionally defective.

Thompson v. Sheppard, 490 F.2d 830, 833 (5th Cir. 1974).

To establish a prima facie violation of the Sixth Amendment's fair cross-section requirement, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Duren v. Missouri, 439 U.S. 357, 364 (1979). With respect to the first element, the Fifth Circuit has held that African Americans are a sufficiently distinctive group for Sixth Amendment purposes. McGinnis v. Johnson, 181 F.3d 686, 689 (5th Cir. 1999). As to the second and third elements, however, Defendant's claim fails.

The accepted methodology for determining the severity of a minority group's underrepresentation on jury panels is to measure the "absolute disparity" between the proportion of jury-eligible members of a distinctive group in the relevant community and its representation in jury venires for that same community. See U.S. v. Garcia, 121 F.3d 704, n.10 (5th Cir. 1997); U.S. v. Maskeny, 609 F.2d 183, 189–90 (5th Cir. 1980). Using the Clerk of Court's AO12 Report statistics, the absolute disparity between the percentage

5

of African Americans in the population of the Alexandria, Monroe, and Shreveport Divisions (32.00%)[4] and the percentage of African Americans on the qualified jury wheel for those same divisions (23.35%) is 8.65%. (See Doc. 150-2). The Fifth Circuit has consistently recognized that absolute disparities of 10% or less are insufficient to satisfy the second prong of Duren. See Garcia, 121 F.3d 704 at *4; U.S. v. Butler, 615 F.2d 685, 686 (5th Cir. 1980); Maskeny, 609 F.2d at 190.

Defendant does not dispute that the Clerk of Court's statistics are fatal to his claim; instead, he looks to alternative data from the 2011 ACS Estimates, which indicate that African Americans age 18 and over comprise 34.16% of the population in the Alexandria, Monroe, and Shreveport Divisions and show an absolute disparity of 10.81%. (See Doc. 160 at pp. 2–3). However, this 34.16% figure, which estimates the percentage of African Americans in the voting-age population of the those three divisions, is not the proper base and is irrelevant for Sixth Amendment purposes. See U.S. v. Yanez, 136 F.3d 1329, at *1 (5th Cir. 1998). The Fifth Circuit has consistently held that "the disparity between the proportion of members of an identifiable class on a jury list must be based not on total population [or the gross voting-age population] but, instead, on those of the

---

[4] During oral argument, the Government acknowledged that the 32.00% figure represents the percentage of African Americans in the voting-age population, rather than the jury-eligible population. The Government argued that the percentage of jury-eligible African Americans in the relevant districts is actually less than 32.00%, resulting in an even lower disparity than the 8.65% figure asserted in this case. For purposes of our present analysis, we will use the 8.65% figure.

identifiable class who are *eligible to serve as jurors.*"[5] U.S. v. Brummit, 665 F.2d 521, 529 (5th Cir. 1981) (emphasis added); see also Yanez, 136 F.3d 1329 at *1 (citations omitted).

But even if we accept Defendant's figures, he has failed to prove that any claimed underrepresentation rises to a legally significant level. In U.S. v. Quiroz, 137 F. App'x 667, 670 (5th Cir. 2005), the Fifth Circuit found a discrepancy of 11.22% between the number of jury-eligible Hispanics in the local population and the number of Hispanics in the in the federal jury pool, which was drawn exclusively from voter registration lists, insufficient to establish a prima facie violation of the fair cross-section requirement. See also Thompson, 490 F.2d 830 (finding an 11% disparity between the number of African Americans in the community and those in the jury wheel insignificant). Defendant does not even allege, much less offer proof, that a disparity of 10.81% is more statistically significant than the 11.22% disparity in Quiroz. Accordingly, Defendant fails to satisfy the second prong of Duren.

Yet, even assuming *arguendo* that the alleged disparity was statistically significant, Defendant has also failed to show that the cause of underrepresentation is systematic, or "inherent in the particular jury-selection process utilized." Duren, 439 U.S. at 366. Defendant suggests that African Americans are systematically excluded from the

---

[5] Under 28 U.S.C. § 1865(b), a person is eligible to serve as a grand or petit juror, unless he:
    (1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;
    (2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
    (3) is unable to speak the English language;
    (4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or
    (5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.

jury-selection process by the choosing of potential jurors' names exclusively from voter registration lists, which he claims provide out-of-date or inaccurate contact information for a significant percentage of African-American voters. However, in U.S. v. Yanez, 136 F.3d 1329 at *2, the Fifth Circuit rejected a similar argument "absent proof that obstacles were placed in the path of minorities attempting to register to vote or to vote." The Yanez court further noted that the JSSA "expressly provides for the use of voter registration lists. Such lists may be used as the *sole source* for selecting jury pools." Id. (emphasis added).

In the present case, the only "obstacle" to minority voter registration Defendant mentions is the State of Louisiana's failure to ensure voter registration at state offices providing public assistance, which is the subject of United States v. Louisiana, No. 3:11-cv-00470 (M.D. La. July 12, 2011) (Doc. 125, Exh.1). Yet, the Government contends this lawsuit is irrelevant to the present case because the complaint is limited to violations of the National Voter Registration Act of 1993, 42 U.S.C. §§ 1973gg, *et seq.* & 28 U.S.C. § 2201, and not the Sixth Amendment, and because it makes no allegations or claims regarding race disparity or any identifiable minority group. While we observe that the Government's current position seems contradictory to its arguments in the Middle District case, we find Defendant's evidence insufficient to establish systematic exclusion under the third prong of Duren.

As noted above, the sole basis for Defendant's claim is the alleged statistical disparity of 10.81%. However, "[a] defendant cannot establish a prima facie violation by relying solely on the composition of the jury at his own trial." U.S. v. Olaniyi-Oke, 199 F.3d 767, 773 (5th Cir. 1999) ("Olaniyi-Oke has no evidence with which to challenge the

selection process . . . but instead wants to investigate solely because *his venire* had 'too few' minorities."). Moreover, the Fifth Circuit has held that "one incidence of a jury venire being disproportionate is not evidence of a systematic exclusion. Therefore, a one-time example of underrepresentation of a distinctive group wholly fails to meet the systematic exclusion element in Duren." McGinnis, 181 F.3d at 690 (internal quotations and citations omitted). For these reasons, Defendant's Motion to Dismiss on the basis of the Sixth Amendment's fair cross-section requirement has no merit.

### B. Fifth Amendment

To establish a Fifth Amendment due process or equal protection[6] violation in the context of grand-jury selection, a defendant must show:

> (1) that the group against whom discrimination is alleged "is one that is a recognizable, distinct class," (2) that the group is underrepresented on jury panels over a significant period of time, and (3) that the selection procedure is not racially neutral, or is susceptible of being used as a tool of discrimination. [citation omitted] These prerequisites must be met before the defendant establishes a prima facie case, shifting the burden to the state to rebut the showing. Additionally, Castaneda[v. Partida, 430 U.S. 482, 493 (1977)] requires the showing of some form of intentional discrimination.

Brummitt, 665 F.2d at 527; see also McGinnis, 181 F.3d at 691 ("As in any equal protection case, the burden is, of course, on the criminal defendant who alleges discriminatory selection to prove the existence of purposeful discrimination." (quotations omitted)).

---

[6] The Supreme Court has stated that "[t]he liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." U.S. v. Windsor, 133 S. Ct. 2675, 2695 (2013).

In Brummit, the defendant introduced statistical evidence showing a 19.6% disparity between the percentage of Hispanics in the total population and the percentage on the master jury list, which was drawn exclusively from the voter registration lists, in support of his constitutional due process claim. 665 F.2d at 527. However, the Fifth Circuit ruled that the statistical evidence, by itself, was insufficient to prove intentional discrimination or to make out a prima facie case of discrimination. Id. Indeed, the Fifth Circuit has held that "a prima facie case of discrimination cannot rest merely on statistics. The fact that an identifiable minority group votes in a proportion lower than the rest of the population and is therefore underrepresented on jury panels presents no constitutional issue." U.S. v. Lopez, 588 F.2d 450, 452 (5th Cir. 1979) (citing U.S. v. Arlt, 567 F.2d 1295, 1297 (5th Cir. 1978)).

Similar to the situation in Brummit, Defendant's present claim rests entirely on statistics showing a 10.81% discrepancy between the percentage of African Americans in the citizen population of the Alexandria, Monroe, and Shreveport Divisions and the percentage of African Americans on the qualified jury wheel for those same divisions. Defendant does not allege, much less offer proof, that African Americans were underrepresented over a period of time, or that the Court's Jury Plan provides an opportunity to discriminate against African Americans. Furthermore, Defendant has wholly failed to show that the alleged disparity of 10.81% is more statistically significant than the 19.6% disparity the Fifth Circuit found insufficient to sustain a showing of intentional discrimination in Brummit. Therefore, Defendant's Motion to Dismiss on the basis of the Fifth Amendment likewise has no merit.

C.  Jury Selection and Service Act

The JSSA provides that all federal court litigants "entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes," and it prohibits the exclusion of citizens from grand or petit jury service based on "race, color, religion, sex, national origin, or economic status." 28 U.S.C. §§ 1861, 1862. According to the Fifth Circuit, the Act

> authorizes the adoption of a jury plan based on the selection of potential jurors exclusively from the voter registration lists, 28 U.S.C. § 1863(b)(2). However, the statute itself provides that the plan shall specify whether the names of prospective jurors shall be selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district or division. The plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title.

Brummit, 665 F.2d at 528 (quoting 28 U.S.C. § 1863(b)(2)).

To obtain relief under the JSSA, a defendant must show "a 'substantial failure' to comply with the Act's provisions, a substantial failure being one that destroys the random nature or objectivity of the selection process." Olaniyi-Oke, 199 F.3d at 772 (citations omitted); see also 28 U.S.C. § 1867(a). The Fifth Circuit has provided the following summary of the jurisprudence governing similar statutory challenges under the JSSA:

> This Court in United States v. Davis, 546 F.2d 583, 589 (5th Cir. 1977), Cert. denied, 431 U.S. 906, 97 S. Ct. 1701, 52 L. Ed. 2d 391 (1977), stated, "Determining the substantial compliance question requires that the alleged violations of the Act be weighed against the goals of the statute." The Court identified the major goal of the statute as the random selection of juries from a fair cross-section of the community; toward that end voter lists are to be the primary source of jurors' names and disqualifications, excuses, exemptions, and exclusions are to be based solely on objective

> criteria, Id. The Court then held that one aspect of the selection process there under review constituted a technical violation of the statute but that the violation in no way affected the random nature or objectivity of the selection process and therefore did not constitute a substantial failure to comply with the statute. In United States v. Goff, 509 F.2d 825 (5th Cir. 1975), Cert. denied, 423 U.S. 857, 96 S. Ct. 109, 46 L. Ed. 2d 83 (1975), this Court stated that to sustain a statutory challenge to grand jury selection procedures, a defendant must show the impact of an absolute disparity on the jury list. Specifically, although a group might be 47.73% underrepresented on a voter registration list, at most this disparity would result in 1.4 fewer persons on a twenty-three person grand jury than if the group's percentage of the population of the community (there 10.51%) were mirrored on a grand jury. This potential impact on a grand jury was held not to be so substantial as to require a supplementation of voter registration lists with other sources for grand jurors. Id. at 827.

Maskeny, 609 F.2d at 191.

In the instant case, Defendant contends the Court's Jury Plan violates the JSSA because the use of voter registration lists as the sole source of potential jurors produces an underrepresentation of African Americans by an absolute disparity of 10.81%. The Government responds that the statistical disparity is only 8.65%, which is not significant enough to require the Court to supplement voter registration lists with additional juror sources. We agree with the Government's argument, and in particular its reliance on U.S. v. Maskeny, 609 F.2d 183.

Similarly to the present case, the appellants in Maskeny alleged that "voter registration lists were an inadequate source of jurors because of a low rate of return of questionnaires (due in part to [sic] the absence of voters' addresses), and that a supplemental source of potential jurors was required." Id. at 191. However, the Fifth Circuit rejected this challenge because the appellants failed to show "either that the use of voter registration lists ha[d] a substantial impact on the composition of the average grand jury or that their use result[ed] in the systematic exclusion of a cognizable group

from jury source." Id. at 192. In so ruling, the Fifth Circuit noted that under the JSSA, "the principal, if not sole, source [of potential jurors] is to be voter registration lists for random selection. Use of such lists as the sole source of names for jury duty is constitutionally permissible unless this system results in the systematic exclusion of a 'cognizable group or class of qualified citizens.'" Id. (quoting Camp v. U.S., 413 F.2d 419, 421 (5th Cir. 1969)). In a subsequent case, the Fifth Circuit also stated that when "a prima facie case of jury discrimination is established, supplementation of the voter list with 'some other source or sources of names in addition to voter lists' is congressionally mandated." Brummit, 665 F.2d at 530 (quoting 28 U.S.C. § 1863(b)(2)).

For the reasons discussed above, Defendant has failed to make out a case of jury discrimination, and has failed to show that the exclusive use of voter registration lists results in the systematic exclusion of African Americans from the Court's jury venire. Defendant has also failed to show that the use of voter registration lists had a substantial impact on the composition of the average grand jury. In fact, the record shows that African Americans comprised 26.09% of the grand jury in this case, which results in a mere 5.91% disparity from the citizen population of the Alexandria, Monroe, and Shreveport Divisions. (Doc. 150-3). Based on these statistics, Defendant cannot even show that the alleged underrepresentation of African Americans had a substantial impact on his *own* grand jury. Accordingly, Defendant's Motion to Dismiss on the basis of the Jury Selection and Service Act has no merit.

III. <u>Conclusion</u>

For the foregoing reasons as indicated, Defendant's Motion to Dismiss Indictment (Doc. 147) will be **DENIED**. Disposition will enter by a separate order signed on this date.

SIGNED on this 9th day of June, 2014 at Alexandria, Louisiana.

_____
DEE D. DRELL, CHIEF JUDGE
UNITED STATES DISTRICT JUDGE